**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 99-40591
cons w/99-40612

_____

**RUTH HILL, ET AL.**

Plaintiffs-Appellants
Cross Appellees,

**versus**

**CITY OF HOUSTON,**

Defendant-Appellee
Cross Appellant.

_____

**Appeals from the United States District Court
for the Southern District of Texas
(G-97-CV-578)**
_____

October 11, 2000

Before JONES and BENAVIDES, Circuit Judges, and COBB, District Judge[*]

COBB, District Judge [**]

Both sides appeal from a jury trial before a magistrate judge. There are three issues before us on appeal. The first is whether the City of Houston had actual notice of the claim under the provisions of the Texas Tort Claims Act. The second issue is whether the evidence at trial was sufficient to support a finding that the negligence of the Houston

_____

[*] District Judge for the Eastern District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-1-

Fire Department caused the plaintiffs' injuries. The third issue is whether the plaintiffs' claims are barred by sovereign immunity as limited by the Texas Tort Claims Act. Because our review of the record in the trial court convinces us as a matter of law that the requisite elements of actual notice were conclusively proven, we reverse the jury's finding that the City did not have notice until December 16, 1997 and affirm the jury's findings on causation and damages. We also hold that the plaintiffs' claims are not barred by sovereign immunity.

## I. BACKGROUND

On December 5, 1995, an employee at station 67 of the Houston Fire Department (HFD) reported to the Fleet Maintenance Division that the pump on Ladder Truck 67 was broken and inoperable. On December 20, 1995, Ladder 67 responded to a house fire in Houston. It was the first truck to arrive but the broken pump prevented the firefighters' access to the home and the homeowner later died in the hospital. On December 21, 1995 a second request to repair the broken pump was made.

On January 4, 1996, a fire at the home of Ruth Hill (Hill) was reported to HFD. Ladder Truck 67 was the first fire-truck on the scene but again, the inoperable pump prevented firefighters from putting water on the fire.[1] Another HFD truck (an Engine truck) arrived within two to two and a half minutes later. (Tr. 250). After pumping water on the fire, the firefighters were able to enter the home and upon entrance, they discovered the bodies of four-year old Alex Freeman and five-year old

---

[1] While another truck, Booster 67 arrived concomitantly with Ladder 67, Booster 67 is not used to fight fires. It is a pickup truck which has a small water tank (used for grass fires) and carries an extra firefighter to the fire.

Crystal Durden on a couch in the den located in the middle of the home. Autopsies revealed that the children died of smoke inhalation, specifically, asphyxia due to soot and carbon monoxide. The apparent cause of the fire was a space heater located in the front room of the house. Tellas Williams, the children's sixteen year old cousin who was babysitting them escaped but was unable to rescue the children.

On January 13, 1996, Ladder Truck 67 responded to yet a third fire without the pump being repaired. On January 22, 1996 the pump was finally inspected and the problem was discovered: a blown twenty-five cent fuse which was replaced in thirty minutes. Captain Boze then wrote and hand delivered a scathing letter to his HFD superiors detailing the problem with the pump and the motor-repair department's troubles in repairing it.[2]

The ladder truck at Houston Fire Station 67 is equipped with a 300-gallon water tank and a pump to use that water directly on the fire without a connecting hose to a fire hydrant. It is called a "quint" because it has five functions: (1) it has a large aerial ladder which can extend 108 feet above the ground; (2) it carries smaller, movable ladders; (3) it carries the "jaws of life" and other tools for entry, ventilation, lighting and search and rescue; (4) it has a pump; and (5) it has a tank to hold water. At most fires an engine truck or pumper is also dispatched. The pumper's primary job is to put water on a fire. It can connect to a fire hydrant and carries a much larger tank and pump than the ladder truck.

---

[2]The letter is fully set out in an appendix attached to this opinion.

On October 6, 1997 the plaintiffs filed suit against the City in Federal district court bringing state law claims under the Texas Tort Claims Act and alleging violations of the United States Constitution. Plaintiffs alleged the City's negligence in failing to maintain and repair the pump caused a delay in the fire department's efforts to rescue the children which resulted in their injuries and eventual deaths. Specifically, plaintiffs alleged that on December 5, 20, and 21, HFD employees reported the pump as a "Priority One" repair which according to department policy required it to be repaired within twenty-four hours. The representative of the decedents sent formal notices to the City on December 16, 1997. The city moved to dismiss the state law claims on the notice issue but the motion was denied by Judge Kent.[3]

After a trial before Magistrate Judge Froeschner, the jury returned a verdict in favor of the plaintiffs but found that the City did not have notice of the claim until December 16, 1997–thus precluding recovery under the Texas Tort Claims Act. The Jury answered as follows:

> Question 1: Was the inoperative pump on Ladder 67 a proximate cause of the death of Crystal Durden and Alex Freeman? Answer "Yes" or "No".
>      Answer: Yes

> Question 2: Do you find from a preponderance of the evidence that the "November 22, 1994 memorandum [sic] (Plaintiffs' Exhibit 8) stated the official policy of the Houston Fire Department regarding the repair of fire trucks during the period from December 5, 1995 to January 4, 1996?   Answer "Yes" or "No."
>      Answer: Yes

---

[3]*See Hill v. City of Houston*, 991 F. Supp. 847 (S.D. Tex. 1998). Judge Kent dismissed the Fifth and Eighth Amendment claims but denied the Rule 12(b)(6)Motion to dismiss with respect to the Fourteenth Amendment, conspiracy, and state law claims.

Question 3: Did the Houston Fire Department violate the official policy? Answer "Yes" or "No."
        Answer: Yes

Question 4: On what date did the Houston Fire Department receive actual notice of Plaintiffs' claims arising from the fire at 2109 Ellington?
        Answer:   12/17/96

Question 5: What sum of money, if paid now in cash, would fairly and reasonably compensate Schanell Durden for her damages, if any, resulting from the death of Crystal Durden?
        Answer:   $100,000.00 (past)
                  $300,000.00 (future)

Question 6: What sum of money would have fairly and reasonably compensated Alex Freeman for-
        Element a. Pain and mental anguish
        Element b. Funeral and burial expenses.
        Answer in dollars and cents for damages, if any.
        Answer: $400,000.00

Question 7: What sum of money would have fairly and reasonably compensated Crystal Durden for-
        Element a. Pain and mental anguish
        Element b. Funeral and burial expenses.
        Answer in dollars and cents for damages, if any.
        Answer: $400,000.00

Plaintiffs filed a motion to set aside the jury verdict or in the alternative for judgment not withstanding the verdict (JNOV) arguing the City had actual notice and that the jury confused "actual notice" with "formal notice." The City filed a motion to set aside the rest of the jury findings. Both of these motions were denied by the magistrate judge who then entered a take-nothing judgment for the City. This appeal by the plaintiffs and cross-appeal by the City followed.

## II.  Standard of Review

We review rulings on motions for directed verdict and for JNOV de novo, applying the same standard as the district court, *Quest Medical, Inc. v. Apprill*, 90 F.3d 1080, 1085 (5th Cir. 1996) (citations omitted).

The standard of review for these motions was succinctly set out in *Boeing Co. v. Shipman*, to wit:

> [T]he court should consider all of the evidence–not just that evidence which supports the non-mover's case–but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting [JNOV] is proper. On the other hand, if there is substantial evidence opposed to the motion[ ], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, [JNOV] should be denied.... [I]t is the function of the jury as the traditional finder of facts, and not the court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d 365, 374-75 (5th Cir.1969) (en banc), overruled on other grounds by *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc). The verdict must be upheld unless the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable [people] could not arrive at any verdict to the contrary." *Scottish Heritable Trust v. Peat Marwick Main Co.*, 81 F.3d 606, 610 (5th Cir. 1996).

## III. The Evidence Presented At Trial

*A. Actual Notice*

The Texas Tort Claims Act (TTCA) states that a governmental unit is entitled to receive notice of a claim not later than six months after the day the incident giving rise to the claim occurred. TEX. CIV. PRAC. & REM. CODE § 101.101(a) (Vernon 1986). This notice requirement does not apply if the governmental unit has actual notice of the claimant's injury or death. TEX. CIV. PRAC. & REM. CODE §101.101(c). The purpose of the notice

-6-

provision is to ensure prompt reporting of claims to enable the governmental unit to investigate the merits of a claim while the facts are fresh and the conditions remain substantially the same. *See City of Houston v. Torres*, 621 S.W.2d 588, 591 (Tex. 1981).[4]

In *Cathey v. Booth*, the Texas Supreme Court held that actual notice to a governmental unit requires knowledge of (1) a death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved. 900 S.W.2d 339, 341 (Tex. 1995). Actual notice may be imputed only when an agent or representative charged with a duty to investigate and report to the governmental unit receives the three elements of actual notice. *See Gonzalez v. El Paso Hosp. Dist.*, 940 S.W.2d 793, 795-96 (Tex. App.–El Paso 1997, no writ); *Dinh v. Harris County Hosp. Dist.*, 896 S.W.2d 248, 253 (Tex. App.–Houston [1st Dist.] 1995, writ dism'd w.o.j.).

The issue in *Cathey* was whether a hospital's medical records conveyed the elements of alleged fault to the hospital. The Texas Supreme Court held merely providing medical records from which one could conclude that the unit was at fault does not constitute actual notice. 900 S.W.2d at 342. The document which purports to give actual notice must clearly convey the alleged fault of the governmental unit in causing the injury. *See e.g., Gaskin v. Titus County Hosp. Dist.*, 978 S.W.2d 178, 182 (Tex.

---

[4]As a Home Rule city, the City of Houston is entitled to establish its own rules adjusting the State statutory time period. TEX. LOC. GOV'T CODE § 51.077 (Vernon 1999). The City's Home Rule Charter Notice period is ninety days. While it is uncontested that the plaintiffs did not give the City formal notice within this period, this is moot in light of our finding that the city had actual notice.

App.–Texarkana 1998, pet. denied) ("Medical records may . . . create a fact issue if they indicate to the hospital its possible culpability in causing the injuries.").

Plaintiffs argue that the letter of Captain Boze constitutes actual notice as a matter of law. We agree. On January 23, 1996, Captain Boze sent a letter to his superiors at the Houston Fire Department which clearly notifies the City of its alleged fault.[5] After detailing his conversations with the repair shop and the three fires in which his unit's response was delayed by the broken pump, Captain Boze wrote: ". . . I cannot understand, the *apparent negligence* on someone's part, in this matter. I am not saying that if the pump had been working on December 20, 1995 [(redacted material)], or January 04, 1996 <u>(Loss of Two Lives)</u>,that the outcome would have been different, this we will never know. *This minor problem, which became a very significant problem, not only affected the victims of the fires and their families, but also the dedicated crew's [sic] of Ladder 67 . . .*" (emphasis added). This letter does more than the medical records in *Cathey*–it gives clear and unequivocal notice that the City's negligence may have contributed to the deaths of the two children and the homeowner in the first fire. Further, on plaintiffs' exhibit 6 there is a handwritten notation indicating that the matter in the motor repair department was discussed with Chief Whitehorn.[6] Hence, the letter achieved the purpose envisioned by the notice statute: it spurred an investigation into the HFD priority repair

---

[5] The letter was undated, but it is undisputed it was received on January 23, 1996.

[6] The memo was received by Tommy Shelton in February 1996 from Deputy Chief Whitehorn. The note was written by Shelton. (Tr.355).

system.

The City argues that Boze's letter did not notify the City of its alleged fault because the idea of potential legal problems never entered his mind when he wrote the letter. Captain Boze's state of mind however, is irrelevant to the issue of whether the City had notice of its culpability. Plaintiffs' exhibit six indicates HFD took the letter seriously enough to investigate the motor shop's operations at the time of the incident. If potential legal ramifications were not on Boze's mind when he wrote the letter, that is certainly not reflected in his writing.

The City next argues that the letter was insufficient to constitute notice because it did not specifically state the names "Crystal Durden" and "Alex Freeman" or any of the other plaintiffs. None of the cases considering actual notice have required the parties be identified with the specificity urged by the city. Captain Boze, an employee with a duty to investigate and report, knew who the victims were because he was at the scene of the fire. Additionally there were several arson, EMS, and incident reports each of which contained the names and addresses of the victims.

Boze's letter indicates that Boze and his HFD superiors knew that (1) two deaths and property damage had occurred; (2) that the "apparent negligence" of the HFD repair facility may have contributed to the children's deaths; and (3) the identity of the parties involved. We find that Boze's letter establishes that the City had actual notice of the plaintiffs' claims as a matter of law nineteen days after the January 4, 1996 fire and that no reasonable jury could have reached a contrary

verdict. We therefore reverse the jury's findings and reverse the magistrate's denial of the plaintiffs' motion for judgment JNOV.

*B.  Sufficiency of the Evidence as to Cause*

On Cross-Appeal the City appeals the district court's order denying the City's motion to set aside certain jury findings. The City first argues that the jury's answer to Question 1 (that HFD's negligence was the cause of the plaintiffs' injuries) was not supported by the evidence. Unlike the jury's answer to interrogatory number four, there is ample evidence in the record to support the finding that the Fire Department's negligence caused the deaths of Alex Freeman and Cyrstal Durden as well as the other injuries.

The City argues that the jury could not have reached the conclusion that the broken pump caused the deaths of the children because the evidence proved the children were dead by the time Ladder 67 arrived and entered the burning house.

At trial, plaintiffs offered evidence which showed that the fire started around 9:55 in the front room of the Hill house. HFD received the call at 9:59 and dispatched the fire trucks at 10:00. Ladder 67 arrived at 10:06 and Engine 31 arrived some two to two and a half minutes later. Dr. Burton, a forensic pathologist with arson investigation experience, testified that based on the autopsies and Shanley's report, the children could have survived up to six minutes after the flashover[7] in the front

---

[7]A flashover occurs when smoke and gasses from the initial fire rise to the ceiling of the room and begin to collect. Eventually this hot cloud mushrooms out until it hits a wall or door where it begins to radiate back down into the room. As the smoke and gas fill the room, the temperature increases until the point that all remaining combustible items in the room ignite, filling the room with flame.

room (until 10:10). Plaintiffs' second expert was James Shanely, an expert in fire investigation. He testified that the fire could have been knocked down in about a minute and that the fire grew significantly larger because of the delay. He concluded that it was a medium-growth fire and that the flashover occurred only in the front room around 10:04. Together, their testimony established a two to three minute window during which the children could have been rescued had it not been for the broken fire pump. The plaintiffs' experts also testified that the defendant's experts used faulty formulas and incorrect measurements.

The City argues this is insufficient to establish proximate cause because it amounts to nothing more than a lost chance of survival. *See Campos v. Ysleta General Hosp*., 836 S.W.2d 791, 794 (Tex. App.–El Paso 1992, writ denied) (holding testimony that "there was a window of opportunity" during which a child "might have been saved" was not sufficient to establish a causal connection between the child's death and the conduct of the two hospitals which refused to treat him). This argument however, only goes to the sufficiency of the evidence on causation, not to the plaintiffs' theory of recovery. The essence of the holding in *Campos* and the other cases on which it is based, is that the "mere medical possibility" (as opposed to probability) that a patient "might" have lived had the doctor not mis-diagnosed the patient's condition is insufficient to constitute proximate cause. Texas courts however, have consistently held that evidence which establishes a medical *probability* that a patient would have survived had it not been for the mis-diagnosis is sufficient to support a finding of proximate cause. *See Campos*, 836 S.W.2d at 795 (citing *Tilotta v. Goodall*, 752 S.W.2d 160,

-11-

163-64 (Tex. App.–Houston [1st Dist.] 1988, writ denied); *see also Bradley v. Rogers*, 879 S.W.2d 947, 953-54 (Tex. App.–Houston [14th Dist.] 1994, writ denied) ("With regard to cause-in-fact, the plaintiff must establish a causal connection based upon 'reasonable medical probability,' not mere conjecture, speculation or possibility.") (citations omitted).

The timeline established by the plaintiffs' experts permits a two to three minute window in which the children would have probably been rescued had it not been for Ladder 67's inability to attack the fire because of the broken pump. Dr. Burton testified that in his opinion, there was a reasonable probability more likely than not that the children could have been saved. (Tr. 670) He noted that other people in house fires have survived flashover situations and that the photos of the scene did not indicate that a flashover occurred in the den.

Finally, the City attempts to undermine the testimony of Burton and Shanely's by challenging their reliability as experts. The City argues that we should ignore the testimony of plaintiffs' experts because they lack the indicia of reliability outlined in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Specifically, the City argues no expert pathologist would have relied on Shanely's determinations as to when the flashover occurred.

This court applies the "abuse of discretion" standard when reviewing a district court's reliability determination for an expert. *See Kumho*, 526 U.S. at 142; *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997). The City however, does not point to any evidence in the record that it objected to the testimony of the plaintiffs' experts on

this ground nor does it argue that the trial court erred in admitting this testimony. In fact, it ignores Dr. Burton's testimony that forensic pathologists regularly rely on other experts in determining how a person died. Instead, the City seems to argue that *this* court should not consider the testimony of the plaintiffs' experts.

The "gatekeeping" obligation imposed by *Daubert* and *Kumho* lies not with this court of appeals, but with the trial court. 509 U.S. at 589; 526 U.S. at 147.   Since the City has failed to identify any error or abuse of discretion by the trial court in admitting the testimony of Shanely or Burton, there is nothing for this court to rule on with regards to the reliability of plaintiffs' experts.

The defendants may not reverse the jury's finding merely because they present evidence and testimony which controverts plaintiffs' theory of events. The evidence is not so overwhelming that a reasonable juror could only conclude that the HFD's failure to repair the pump was not the cause of the plaintiffs' injuries.   There is sufficient evidence to support the jury's finding on proximate cause and therefore, there is no reason to disturb the jury's answer to the first interrogatory. Accordingly, the district court's denial of the City's Motion to set aside the jury's findings as to question one is affirmed.

*C. Questions two and three: Official Policy*

The City next challenges the denial of the City's Motion to Set aside the jury's findings to questions two and three-that the city had an official policy on repair priority codes which was violated by HFD's

failure to timely repair the pump. At trial, plaintiffs relied on Exhibit 8, a copy of a purported memorandum from "J.L. Reyes, Assistant Fire Chief" to Tommy Shelton, Master Mechanic dated November 22, 1994. The memo is signed by Head Fire Chief E. A. Corral and the "cc" at the bottom of the page indicates he was also sent a carbon copy. The memo is also stamped "Received, Jan. 11, 1995, HFD Fleet Management." The memorandum establishes six different priority codes for repairs and the response time required for each. "Priority Code 1.0" is the highest, its states: "IMMEDIATE ACTION REQUIRED / SAME DAY AS REPORTED." The next is "Priority Code 2.0 TWO DAY RESPONSE OR ADDRESS AS SOON AS PRACTICAL." The City makes two arguments: (1) that exhibit eight was never authenticated, and (2) that it is a fake.

Exhibit eight was first admitted during direct testimony of Chief Eddie Corral. At a bench conference, the City's attorney objected on the grounds that the memo was "not authentic." The court overruled the objection and admitted exhibit eight into evidence. (Tr. 130). Later, Jim Kelley, a shop foreman, testified that he received the memo and identified it as the priority code system in place at the time the repairs were requested and the fire at the Hill residence. (Tr. 385). Later, Jeff Moore, a GEMS 2000 computer technician, claimed to have seen the document in August of 1995. (Tr. 1440-41). At trial however, both witnesses admitted that they could not be sure that they had seen the memo in 1995 or 1996. On the other hand, Chief Corral testified that he never signed the document even though his signature appears on it. The City also points to numerous inaccuracies, such as a different letterhead and that Chief Corral did not have staff meetings on Mondays during

that period of time to support its argument that exhibit eight was forged.

We review the district court's ruling on authentication for abuse of discretion. *See Snyder v. Whittaker Corp*., 839 F.2d 1085, 1089 (5th Cir. 1988). That ruling will not be disturbed unless there is no competent evidence in the record to support it. *See Meadows & Walker Drilling Co. v. Phillips Petroleum Co*., 417 F.2d 378, 382 (5th Cir. 1969). Even then, error may not be predicated upon the court's ruling admitting the evidence unless a substantial right of the party is affected, and (in the case where evidence is admitted) there is a timely objection stating the specific ground. *See* FED. R. EVID. 103(a); *see Foster v. Ford Motor Co*., 621 F.2d 715, 721 (5th Cir. 1980).

To prove authenticity, the proponent must present evidence sufficient to support a finding that the recording is an accurate reproduction of the matter recorded. *See United States v. Biggins*, 551 F.2d 64 (5th Cir.1977); FED. R. EVID. 901(a). While the trial judge ensures there is sufficient (or prima facie) evidence of authenticity, the ultimate determination of whether to believe the evidence is left for the fact-finder to decide. *See United States v. Caldwell*, 776 F.2d 989, 1001-01 & n. 16 (11th Cir. 1985) ("Once [a prima facie showing that the proffered evidence is what it purports to be] has been made, the evidence should be admitted, although it remains for the trier of fact to appraise whether the proffered evidence is in fact what it purports to be."); 5 WEINSTEIN'S FEDERAL EVIDENCE, 901.02[2] (2d ed.).

Rule 1003 (aka "the best evidence rule") permits a duplicate to be

admitted on the same basis as an original unless (1) a genuine issue is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original. FED. R. EVID. 1003. However, Rule 1008 makes clear that "when an issue is raised (a)whether the asserted writing ever existed, or (b) whether another writing . . . produced at trial is the original, or (c) whether other evidence of contents correctly reflects the contents, the issue is for the trier of fact to determine as in the case of other issues of fact." Thus under either rule, the question of whether exhibit eight is a fake or rather, authentic copy was a fact question which was properly submitted to the jury.

As noted above, this court reviews the jury's decision under a "sufficiency of the evidence" standard. We will not disturb the jury's findings unless no reasonable jury could reach that conclusion.

In the present case, several witnesses testified about the existence of an official repair priority policy at the time of the Hill Fire. While the credibility of some of them was hotly contested, we cannot substitute our judgment for that of the jury. Nor can we find that the trial court committed any abuse of its discretion in admitting exhibit eight. We therefore, affirm the magistrate judge's denial of the City's motion to set aside the jury findings as to questions two and three.

*D. Questions Six and Seven Damages*

The City next appeals the magistrate's denial of its motion to set aside the jury's findings on damages. It argues there was no evidence

that Alex Freeman and Crystal Durden suffered any pain or mental anguish because they were unconscious by the time the Ladder 67 arrived at the scene. The City points to the testimony of Tellas Williams, the children's sixteen year old cousin and James Williams (no relation), a passing truck driver who both last heard the children's screams long before Ladder 67 arrived.

At trial however, James Williams testified upon being re-called that he heard the children screaming after he broke a window on the side of the house just before Ladder 67 arrived at the scene. (Tr. 1049). Moreover, the testimony of Dr. Burton and Mr. Shanely establish that the children were probably alive for a few minutes during the time which the crew of Ladder 67 could have rescued them had their pump not been broken. We therefore affirm the magistrate's denial of the City's motion to set aside the jury's findings on questions six and seven.

## IV. Sovereign Immunity

The City also appeals the district court's denial of its Motion to Dismiss or for Summary Judgment on sovereign immunity. It argues it is entitled to sovereign immunity on three separate statutes. Governmental immunity shields the City from tort liability except where such liability is specifically waived under the TTCA. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994).

*A. Civil Practice and Remedies Code § 101.021*

This section of the Texas Tort Claims Act provides a waiver of

sovereign immunity as follows:

> A governmental unit in the state is liable for:
> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
> > (A)    the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
> > (B)    the employee would be personally liable to the claimant according to Texas law; and
> (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE § 101.021 (Vernon 1997).  Thus, section 101.021 provides two avenues of liability. The City may either be sued (1) for the negligence of an employee acting within the scope of his employment if the damage or death is proximately caused by motor-driven equipment, or (2) for personal injury or death caused by a condition or use of tangible personal property if the governmental unit would, were it a real person, be liable to the claimant under Texas law.

The City makes three arguments that its sovereign immunity has not been waived under this section. It first argues there is no evidence that the pump caused the deaths of the children. Next it argues that the broken pump constituted a "non-use" of property rather than a "use." Finally, the City argues it is not liable for the non-use of information.


1. Causation

The City argues that the plaintiffs' injuries did not arise out of the use of the pump on ladder 67.  This however is nothing more than that causal argument which was discussed and dispensed with above.

The term "use" as it relates to the Texas Tort Claims Act has been

-18-

defined to mean "to put or bring into action or service; to employ for or apply to a given purpose." *See Kassen v. Hatley*, 887 S.W.2d 4, 14 (Tex. 1994) (citing *LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.2d 49, 51 (Tex. 1992)). A study of the case law however reveals that this is really a requirement that the property's condition or use must be the proximate or legal cause of the injury. *See Dallas County Mental Health and Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998) (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995); *Kassen*, 887 S.W.2d at 14; LeLeaux, 835 S.W.2d at 51.

The same line of reasoning was followed in *Schaefer v. City of San Antonio*, 838 S.W.2d 688 (Tex. App.–San Antonio, 1992 writ denied) which the City also cites. In that case a homeowner sued the city for failure to fix a broken water main which flooded his property. To avoid the TTCA, plaintiff claimed that the use of high pressure water pumps to move water through the system constituted a use of motor driven equipment. The court of appeals rejected the claim holding that the "pleading and proof related to matters involving the practical application of the principles or processes of directing and controlling water distribution to the City of San Antonio, not to the practical application of principles or processes of using or operating motor-driven equipment." *Id*. at 692.

In the present case the plaintiffs' claims clearly arise from the broken pump on Ladder 67. It is not tangential to the negligence inquiry as the pleading and proof directly relate to the malfunction of motor-driven equipment. The claims thus fall under the provisions of 101.021.

2. The non-use arguments

The City next argues that it cannot be held liable for the non-use of fire equipment. The City claims that since the pump was broken, it was not "used" within the meaning of the TTCA at the Hill fire.[8] This narrow reading of the statute would eviscerate its very purpose and ignores the fact that Ladder 67 itself is a piece of motor-driven equipment. Moreover, such a holding would lead to in an inherently contradictory result: granting immunity where the City did not use the equipment because they knew it was broken but not giving immunity where they attempted to use the pump at the scene and found it to be broken.

The City next argues that it cannot be held liable for the non-use of information because information does not constitute tangible personal property for the purposes of a waiver under section 101.021. This however, is moot given that the use of Ladder 67 is sufficient to constitute a waiver under the statute.

Thus, section 101.021 offers the City no relief from liability. We therefore find that sovereign immunity is waived under section 101.021 and affirm the district court's denial of the City's Motion to Dismiss.

*B. Official Immunity of its Employees*

The City next argues that even if 101.021 provides a waiver of immunity, it still is immune because its employees have official immunity. A governmental entity in Texas is not liable "for the negligence of its employee when the employee has no liability because of

---

[8]In the lower court, Judge Kent denied the City's Motion for Failure to State a Claim and with respect to this argument, wrote it was "utterly ridiculous and frivolous, to the point of being contemptible." *Hill v. City of Houston*, 991 F. Supp. 847, 852 (S.D. Tex. 1998).

official immunity." *DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995). If the employee is protected from liability by official immunity, the state retains its sovereign immunity under both subsections (1) and (2) of section 101.021. *Id*.

The purpose of official immunity is to protect public officers from civil liability for conduct that would otherwise be actionable. *See Chambers*, 883 S.W.2d at 653-54. Government employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. *See Id*. at 653. The City contends it meets all three requirements, the plaintiffs argue that the decision to repair the pump according to the priority code it was assigned was not discretionary, but ministerial.

The focus of the official immunity inquiry is whether the employee was performing a ministerial or discretionary function. As the Texas Supreme Court stated in *Chambers*: "If an action involves personal deliberation, decision and judgment, it is discretionary; actions which require obedience to orders or the performance of a duty to which an actor has no choice, are ministerial." *Id*. at 654.

The City argues that its actions regarding the repair of the pump on Ladder 67 were discretionary, specifically, (1) the decision by Captain Boze to leave the defective truck in service, (2) the decision of the Fleet Maintenance Service writer to enter pump repair requests as priority two rather then as priority one; and (3) the decisions by the shop foreman and mechanics to decide which equipment to repair first. The plaintiffs rely on exhibit eight, the policy memorandum to establish that

a mandatory policy existed and that it was violated with respect to the repair of the pump.

We first note that the written policy in exhibit eight, states with respect to priority two repairs: "TWO DAY RESPONSE OR ADDRESS AS SOON AS PRACTICAL." The codes then allow for seven day, thirty day, and thirty -day plus response times. The pump was first reported broken on December 5, 1995 but was not repaired until January 22, 1996 which was over a month and a half later. Captain Boze's letter indicates that the mechanic who eventually worked on the pump only heard of the pump problem on January 22nd. It is apparent, as Captain Boze noted in his letter, that the repair shop had a mandatory policy to fix the pump within a certain period of time. While the mechanics may have had discretion to repair the pump within the two days or as soon as practicable after the problem is reported, their duty to repair was ministerial in the sense that they had to do it within a certain amount of time. They had no discretion to fix the pump over a month and a half later. We therefore find that the HFD's duty to repair the pump within the time designated by the memorandum contained in exhibit eight was ministerial and that the policy was negligently implemented. *See Jenicke v. City of Forest Hill*, 873 S.W.2d 776, 780 (Tex. App.–Fort Worth 1994, no writ).

C. Discretionary function, §101.055(3)

The City's next argues it is entitled to sovereign immunity under Tex. Civ. Prac. & Rem. Code § 101.055(3) (Vernon 1997) which limits the waiver of sovereign immunity to certain governmental functions. Section 101.055(3) states: "This chapter does not apply to a claim arising: . .

. (3) from the failure to provide or the method of providing police or fire protection." The purpose of this limitation is to avoid judicial review of policy decisions made by a governmental unit in charge of providing police or fire protection. *See State v. Terrell*, 588 S.W.2d 784, 788 (Tex. 1979).

The City argues it falls under the exception because the present suit is based on its policy decisions with respect to the repair of the pump on truck 67. However, as *Terrell* noted, section 101.055(3) only exempts governmental decisions in formulating policy; it does not provide a general exclusion for any act or omission that occurs while an officer is providing police or fire protection to the public. *Id*. at 787–88. If an employee acts negligently in carrying out the policy, government liability may exist under the act. *Id*. at 787; *Jenicke*, 873 S.W.2d at 780.[9]

Thus, the waiver of sovereign immunity again depends on whether the repair shop failed to comply with what purports to be the official policy of the HFD repair facility contained in exhibit eight. As noted above, we conclude that the jury did not err in determining that such a policy existed and that the City violated this policy. Thus, we cannot find that

[9]In *Fernandez v. City of El Paso*, 876 S.W.2d 370 (Tex. App. – El Paso 1993, writ denied), a Texas Court of Appeals held that a claim based on "the allegedly inadequate condition" of El Paso's "firefighting apparatus and protective clothing" fell within the section 101.055(3) exception. *Fernandez*, 876 S.W.2d at 376. Though the facts in *Fernandez* are sparse, the claim referred to by the court may be construed as focusing on the general inadequacy of El Paso's firefighting system and equipment, i.e., the method adopted by the City. In the present case, however, plaintiffs do not challenge the City's general policy regarding firefighting equipment (method); instead, their claims rest on the negligent execution of the City's policy on equipment repair. Plaintiffs' claims thus fall under *Terrell* and *Jenicke*, not *Fernandez*.

section 101.055(3) provides sovereign immunity to the City.


*D. Sovereign Immunity under Section 101.056*

The City's last argument for sovereign immunity comes under Tex. Civ. Prac. & Rem. Code §101.056 which states:

> This chapter does not apply to a claim based on:
> (1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or
> (2) a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.

Sovereign Immunity under this section turns on whether the HFD's decision as to when to repair the pump was subject to a mandatory policy or was discretionary which was discussed above. Given that we have held that the HFD's duty to comply with the priority policy was ministerial, § 101.056 offers no relief from the waiver of sovereign immunity in §101.021.


**V. CONCLUSION**

For the foregoing reasons, we REVERSE the magistrate judge's denial of the Plaintiffs' motion to set aside the jury's finding on actual notice (question four) and AFFIRM the magistrate judge's denial of the City's Motion to Set Aside the remainder of the jury's findings. We also AFFIRM the district court's denial of the City's Motion to Dismiss on grounds of Sovereign Immunity and REMAND this cause to the district court for judgment in accordance with this opinion.

**REVERSED IN PART, AFFIRMED IN PART.**

**Plaintiff's Exhibit #6, The Boze Letter**


To:     Assistant Chief Reyes
        Deputy Chief K. Whitehorn
        Chief Mechanic T. Shelton
Re:     Fire pump on Ladder 67

    Dear Sirs:

    On December 5, 1995 Engineer/Operator Raymond J. Pooler, PR #54955, called the service writer at motor repair, and reported the fire pump on Ladder 67 was not operating.

    On December 20, 1995, the "C" shift at Station 67, responded to a reported house fire at 6701 Cohn, ID #951220428, at 2043 hrs., Ladder 67 was the first unit to go to 97, due to E-67 being out of service on an EMS call.  It was reported that someone was still inside the home.  Upon 10-97, Ladder 67 observed fire coming from a one story residence.  Ladder 67 was not able to perform a rescue attempt, because they had no way to charge their 1 3/4 hand line, due to the pump not working. . . . [redacted material]

    On December 21, 1995, Engineer/Operator Raymond J. Pooler, again contacted Motor Repair about the fire pump on Ladder 67.  He talked to a person named Lloyd, who referred him to a person named Stewart, who identified himself as the Acting Shop Foreman.  Stewart said he would pull the paper work and call him back.  He did call Engineer/Operator Pooler back, and said the pump was bad, and a new pump had been ordered. Engineer/Operator Pooler told Mr. Stewart that we at Station 67, felt like it was not the pump, but something electrical.  Mr. Stewart indicated that a mechanic had looked at Ladder 67, and said the problem was the pump.  Engineer/Operator Pooler informed Mr. Stewart of the incident the "C" shift had on December 20, 1995, in which one fatality occurred.  Mr. Stewart said a pump had been ordered, and that was all he could do.

    On January 04, 1996 Ladder 67 responded to a reported house fire at 2109 Ellington, ID #960104149, at 1000 hrs.  Ladder 67 was the first unit to go 10-97, due to Engine 67 being out of service at the radio shop.  While Ladder 67 was enroute to the house fire, it was reported that children were possibly trapped.  Upon 10 97, Ladder 67 observed a heavy fire condition, but again was unable to use their pump.  Two children perished in this house fire.

    . . . . . [redacted paragraph]

    On January 22, 1996, Captain K. W. Owens of Station 67-D contacted Mechanic Grube by telephone, and requested his assistance in getting the

fire pump repaired.  Mechanic Grube stated that he did not work on Ladder Trucks, but he would contact the mechanic that did work on Ladder Trucks, and have him come by Station 67.  At 1123 hrs. on January 22, 1996, Mechanic Rosenquist arrived at Station 67 to look at the fire pump on Ladder 67.  I  relayed to Mechanic Rosenquist our theory about the problem being electrical.  He stated that this was a possibility.  Upon further investigation of Ladder 67, he discovered a blown fuse, and corrected the problem.  I asked Mechanic Rosenquist how this could be, when Mr. Stewart had informed us the problem was a bad fire pump. Mechanic Rosenquist looked puzzled, and the only reply he could give was that "I don't know, since I am the only mechanic that works on Ladder Trucks in all four quadrants, and this was the first time I have looked at Ladder 67 for this problem."

In my opinion, there is a problem at Motor Repair that needs to be addressed.  I have been in the department for twenty years, and consider myself a professional, and a dedicated servant to the citizens I serve. I have always tried to be understanding when there is a problem in another division or area in this department.  However, I can not understand, the apparent negligence on someone's part, in this matter. I am not saying that if the pump had been working on December 20, 1995. . . or January 04, 1996 (<u>Loss of Two Lives),</u> that the outcome would have been different, this we will never know.  This minor problem, which became a very significant problem, not only affected the victims of the fires and their families, but also the dedicated crew's of Ladder 67, along with their families.

Your assistance in an investigation into this matter is strongly urged, and would be greatly appreciated by myself and the Firefighters of Station 67, along with the citizens we serve.
Respectfully submitted,

    E.W. Boze
    Senior Captain
    Station 67-D

    HANDWRITTEN NOTE BY SHELTON ON THE BOTTOM OF THE PAGE:

    This was discussed with Chief K. Whitehorn on December [January] 21.  Steven Steward was riding in Higher Class as Hwy Duty Shop Foreman. Shop Foreman was riding most because I was on scheduled vacation.  I was not made aware of this situation until I received this faxed letter.  I have instructed the mechanics and shop foremen to always check out Fire Pumps that are reported out of service as quickly as possible.