Melanie SNYDER, et al.,
Plaintiffs–Appellees,

v.

WHITTAKER CORPORATION,
Defendant–Appellant.

Billie Fay ALLEN, et al.,
Plaintiffs–Appellees,

v.

WHITTAKER CORPORATION,
Defendant–Appellant.

No. 86–6002.

United States Court of Appeals,
Fifth Circuit.

March 14, 1988.

---

Jack L. Allbritton, Houston, Tex., for Whittaker Corp.

Timothy H. Pletcher, Houston, Tex., for Snyder.

Anthony E. Pletcher, Yancey White, Corpus Christi, Tex., for Allen.

Mary Ellen Blade, Beaumont, Tex., for Joseph Buckmaster, et al.

Before BROWN, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

A boat manufacturer appeals a judgment for two crewmen in a Death on the High Seas Act (DOHSA) suit. The manufacturer raises issues of sufficiency of the evidence, admission of evidence, and damages. For the reasons outlined below, we affirm.

## I. BACKGROUND

In 1978, Desco Marine, a division of Whittaker Corporation (Whittaker), built a seventy-five foot shrimp boat. The boat was bought by Jack Yardley, who sold it in 1979 to the partnership of Joe Buckmaster and Andrew Allen. Allen operated the boat, now named the TEXAS LADY, while Buckmaster handled financial and business matters. Allen was an experienced shrimp boat captain.

In late March, 1983, Captain Allen and a deckhand, Robert Cameron, set out from Freeport, Texas, on a shrimping trip. Because a crew member failed to show up, the boat was one short of its normal three-man crew. On April 6, 1983, at around 5:45 in the evening, Ron Banta, the supervisor on an ANR Pipeline drilling platform on the outer continental shelf, felt a jar to the platform. Banta later testified that the jar felt like the impact boats normally made when attempting to dock at the platform. Seeing no boat at the main platform, Banta walked to the other side to look at a smaller platform supporting a gas flare stack, about 500 feet away at the end of a cat walk. About twenty-five to thirty yards from the flare stack, Banta saw a shrimp boat. He saw two crew members, one of whom leaned over to examine the hull near the bow and then walked back to talk to the other. The crew showed no signs of distress and did not attempt to contact the rig. Banta went back to work.

About forty-five minutes or an hour later, a rig employee told Banta that a shrimp boat was sinking at about 300 feet away. Banta radioed the Coast Guard, which had already received a distress call at 5:47 p.m. In the dusk, Banta thought he could see a capsized boat and a figure clinging to the hull. The Coast Guard res-

cue team was unable to save Allen and Cameron; their bodies were never found.

Eighteen hours after the distress call, a team of Coast Guard divers headed by Howard Teves found the TEXAS LADY, keel up, with its bow imbedded in the bottom forty feet below the surface. The water around the bow was too murky for anything to be seen, but Teves was able to feel a sizeable hole in the hull about two feet from the keel near the port bow. Teves later testified that the hole had smooth edges and appeared to have burned through from a heat source within the vessel. Teves also testified that the boat's outriggers, normally held horizontally while a boat is a sea, were tied upright, making the boat unstable. The Coast Guard report attributed the sinking to collision with "an unknown submerged object." Record, Vol. 5 at 313. The TEXAS LADY later broke up and was never salvaged.

On April 9, Captain Allen's brother, Donald Allen, reached the spot with David Sullivan, a certified diver and nephew of Andrew Allen's widow. Donald Allen and Sullivan attempted, fruitlessly, to find the bodies. They also took photographs of the flare stack supports, showing white paint and scrape marks. Sullivan dived down to the bow of the wreck and, because visibility had improved, was able to see a hole in the port bow near the waterline. Sullivan testified that the hole was jagged.

Allen and Cameron's representatives (Snyder and the other plaintiffs) sued the ANR Pipeline Co. and Whittaker under DOHSA and the Texas Survival Statute. 46 U.S.C. § 761 et seq.; Tex.Civ.Prac. & Rem.Code § 71.021. At trial, Snyder presented evidence that ANR had not sounded its foghorn as required by Coast Guard regulations. ANR settled on the last day of trial. In the suit against Whittaker, the boat manufacturer, Snyder attempted to prove that Whittaker had defectively designed and manufactured the TEXAS LADY, and had misrepresented the strength of its shrimp boats' hull in sales literature. The gist of Snyder's case was that Whittaker's decision to build its shrimp boat hulls of two materials—balsa-

core material above the waterline and fiberglass laminate below—created weak points or "stress spots" that allowed a small impact to cause a large hole. Both sides presented expert testimony. The jury rejected Snyder's misrepresentation and defective manufacture claims, but found that the TEXAS LADY had been defectively designed and that this design had caused the accident. The jury allocated 10 percent of the fault to ANR pipeline; 50 percent to Whittaker; 35 percent to Allen; and 5 percent to Cameron. The jury awarded $100,000 for the pain and suffering of each decedent. Allen's family was awarded $300,000 for lost inheritance; $736,000 for past and future loss of support and services; and $107,600 for the Allen children's loss of care and support. The district court granted prejudgment interest on past damages. After seeking in vain a judgment n.o.v., Whittaker appealed to this Court.

## II. DISCUSSION

### A. *Evidentiary Issues*

Whittaker raises several evidentiary issues. First, Whittaker contends that the district court erred in handling the testimony of James C. Flanagan, an expert witness called by Snyder. Whittaker suggests that Flanagan should have been prevented from testifying because Flanagan is a "professional expert" who earns a substantial portion of his income from trials. Because Whittaker did not raise this objection in the district court, it is barred here unless it involved plain error. Fed.R.Evid. 103. This Court has held that a witness cannot be disqualified merely because he "spends substantially all of his time consulting with attorneys and testifying...." *In re Air Crash Disaster at New Orleans, La, Eymard,* 795 F.2d 1230, 1234 (5th Cir. 1986). Moreover, Whittaker was able to bring before the jury Flanagan's experience as a professional witness. The district court had no reason to exclude Flanagan's testimony on this ground.

Whittaker also argues that Flanagan should not have been allowed to indulge in "speculation" about the speed at which the TEXAS LADY struck the platform. However, Flanagan's testimony on speed is more aptly characterized as an expert opinion, expressly allowed by the Federal Rules of Evidence. Fed.R.Evid. 702. The facts on which Flanagan based his opinion as to speed were laid out before the jury; Whittaker was free to argue—and did argue—that these facts were thin. Similarly, the district court did not err in allowing Flanagan to give his opinion on the TEXAS LADY's design. The Federal Rules envision that such opinions can be given in response to hypothetical questions or facts presented to the expert at trial. Fed.R.Evid. 703. Whittaker had the same latitude with its own experts.

Second, Whittaker argues that the district court erred in admitting certain documents. One document was a magazine article lauding balsa-core material, which Whittaker objected to as not properly authenticated. However, Fed.R.Evid. 902(6) dispenses with "[e]xtrinsic evidence of authenticity" for printed articles from periodicals.

Whittaker also contests the admission of notes written by Charles Underwood, former senior manager of the Desco engineering department. At trial, Whittaker objected to the notes on the ground that "the author of it is not here." Assuming that this objection went to authentication of the notes, it has no merit. Federal Rule of Evidence 901(a) requires only "evidence sufficient to support a finding that the matter in question is what its proponent claims." A district court's ruling on authentication can be reversed only for abuse of discretion. *United States v. Feldman,* 788 F.2d 544, 556 (9th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 955, 93 L.Ed. 2d 1003 (1987); *Meadows and Walker Drilling Co. v. Phillips Petroleum Co.,* 417 F.2d 378, 382 (5th Cir.1969). Whittaker's witnesses acknowledged that Underwood was a senior employee of the design department, and Whittaker produced the Underwood notes during discovery. The district court did not err in accepting these facts as adequate authentication, particularly since Whittaker has never claimed that the notes were not Underwood's.

Third, Whittaker objected to the admission of a memorandum between two officers in the sales division of Baltek, Norman Boyer and Ray Olson, dated December 3, 1974. This "Baltek memo" reported the results of a computer analysis that purportedly showed balsa-core material to be over four times stiffer than fiberglass laminate without balsa. The writer expressly observes that his calculations do not take into account the effect of a stringer system. The writer closes with a suggestion that the analysis be sent to Desco. In fact, the memorandum was unearthed from Desco files during discovery. We reject Whittaker's challenge to the authentication of this document, for the reasons given in our discussion of the Underwood notes.

However, Whittaker also objected that the memo was hearsay. Snyder counters that the memo qualified under the business record exception to the hearsay rule. Fed.R.Evid. 803(6). The proponent of a document offered under the business record exception must show that the document was prepared in the regular course of its *author's* business. *United States v. Tafoya,* 757 F.2d 1522, 1528–29 (5th Cir. 1985), *cert. denied,* 474 U.S. 921, 106 S.Ct. 252, 88 L.Ed.2d 259 (1985); *United States v. Rosenstein,* 474 F.2d 705, 709–10 (2d Cir.1973); *Hussein v. Isthmian Lines, Inc.,* 405 F.2d 946, 948–49 (5th Cir.1968). Snyder at most offered evidence that the Baltek memorandum was written by Baltek employees and received and kept by Desco. This showing does not suffice under Rule 803(6). Nor can the memo be admitted under Fed.R.Evid. 703, as data underlying an expert opinion. The Baltek memorandum was not shown to be "of a type reasonably relied upon by experts in the particular field." Fed.R.Evid. 703.

However, a statement does not fall under the hearsay rule if it was offered, not to prove the truth of the matter asserted, but to prove that the statement was made. Fed.R.Evid. 801(c). Snyder used the Baltek memo chiefly to question Whittaker's expert, David Strickland. The questioning was directed at determining whether Desco Marine had notice that fiberglass laminate lacked stiffness and would require extra support. Record Vol. 7 at 761–69. The questions pursued a theory of liability—apparently misrepresentation—that went to the jury, although the jury rejected it. For the purpose of proving that certain statements were made to Desco by Baltek, the Baltek memorandum is not hearsay.

However, the district court did not instruct the jury to consider the Baltek memorandum only for its nonhearsay use. The jury may well have interpreted the memo as supporting Snyder's contention that fiberglass was not stiff enough. Mindful that we may not reverse on the basis of an evidentiary ruling unless that ruling affects "a substantial right of the party," we hold that any error as to the hearsay use of the memo was harmless. Fed.R.Evid. 103(a). The memo was cumulative in that the jury heard other testimony that fiberglass was less stiff than balsa-core material. Other statements in the memo—particularly Baltek's acknowledgment that a stringer system could compensate for loss of stiffness—were favorable to Whittaker; indeed, Whittaker's counsel had Strickland read part of the memo to the jury, and it was Whittaker, not Snyder, who referred to the memo extensively during closing argument. Under these circumstances, the district court's failure to warn the jury against hearsay use of the memo did not constitute reversible error.

B. *Sufficiency of the Evidence on Liability*

Whittaker contends that the district court erred in denying Whittaker's motions for a directed verdict and for judgment n.o.v. In reviewing such motions, this court considers all the evidence and avoids second-guessing conflicts in the evidence or credibility determinations. *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969). This court will not disturb a jury verdict based on substantial evidence and reasonable inferences. *Taylor v. Texaco, Inc.,* 814 F.2d 231, 235 (5th Cir.1987); *Shipp v. General Motors Corp.,* 750 F.2d 418, 420–21 (5th Cir.1985); *Boeing,* 411

F.2d at 374–75. Whittaker argues that Snyder did not present substantial evidence to prove either that the TEXAS LADY was defectively designed or that any design defects caused the accident.

Turning first to defective design, we observe that the jury faced a classic conflict of experts. Snyder's expert, Flanagan, testified that balsa-core material was much stiffer than fiberglass laminate and that the combination of the two materials could cause the impact of a blow above the waterline to be transmitted below the waterline, breaking a hole. Whittaker's experts, Strickland and Phillips, testified about structural safeguards at the connection between the materials and about the stringer and floor structures supporting the lower, fiberglass hull. Snyder elicited from Strickland the fact that, in the bow area around the fuel tank, there was a plywood stiffener at the forward end of the tank but that there were no other stiffeners for the length of the tank. Whittaker's witnesses also testified as to the advantages of the two-material hull. Snyder's expert argued that the TEXAS LADY design did not adequately compensate for forseeable stress spots arising out of the dual material construction; Whittaker's experts testified that the design did adequately compensate. The jury chose between these conflicting opinions, and the district court did not err in refusing to disturb that finding.

With regard to causation, Snyder reconstructed the accident in this way: the TEXAS LADY, due to negligence by the crew and the platform, collided at a relatively low rate of speed with the flare-stack supports. The TEXAS LADY then moved about twenty-five to thirty yards away. Allen and Cameron leaned over the bow side to look for damage, but showed no signs of panic because impact had been slight. The impact near the waterline, however, had been transmitted from the balsa-core hull to the fiberglass hull in such a way as to cause a hole in the fiberglass below the waterline. Allen and Cameron realized their danger and radioed to the Coast Guard at 5:47 p.m. By 6:35 p.m. the shrimp boat had capsized.

Whittaker argues that there was no evidence that the TEXAS LADY did collide with the platform or that the collision was at a low speed. However, Snyder did present Ron Banta's testimony that he felt a jar and that it was no greater than the impact of a docking boat. The jury saw photographs and heard testimony that there were paint smears on the side of one of the flare stack supports a few days later. When Banta saw the crew of the shrimp boat, they were examining the hull near the bow waterline, but showed no panic. This behavior, also, is consistent with the hypothesis that a collision occurred but was a slight one. In addition, the distance that the TEXAS LADY travelled between the impact and Banta's sighting was not great, supporting an inference that the boat's speed was low. In short, the jury did hear substantial evidence that a slight collision occurred between the TEXAS LADY and the platform.

As previously discussed, the jury chose to credit Snyder's expert and to believe that defective design of the TEXAS LADY allowed a relatively slight blow to the upper hull to cause a hole in the lower hull. Although both sides agreed that there was a hole in the hull, the two divers, Teves and Sullivan, presented somewhat inconsistent testimony on what kind of hole it was and where it was located. Teves found a smooth-edged hole near the keel in the bow area. He testified that the hole was of a type not caused by collision, but by the burning through of an internal heat source. Sullivan found a hole higher up, with rough edges. Such a hole would be more consistent with a collision. Each diver's testimony had weaknesses, which were brought out before the jury. Teves was an experienced salvage diver and came on the scene soon after the sinking; however, visibility was so limited at the time of Teves' dive that he could only feel the hole with his hands. Sullivan, on the other hand, was a less-experienced diver, but made his dive under better conditions and was able to see the hole. The jury was entitled to reject Teves' "internal heat source" theory and to credit Sullivan's testimony insofar as it conflicted with Teves'.

At each step in reconstructing the sinking of the TEXAS LADY on April 6, 1983, the jury heard conflicting testimony backed up by some physical evidence. The jury chose to resolve the conflicts in the testimony in such a way as to impose liability on Whittaker, and the jury's resolution is supported by more than a scintilla of evidence. We decline to disturb this resolution.

### C. *Allocation of Fault*

■ The jury found that many causes contributed to the loss of the TEXAS LADY. Captain Allen chose to set sail with less than a full crew; the crew failed to keep an adequate lookout; the platform failed to use its foghorn; and the boat design allowed a minor collision to make a large hole. Whittaker argues that the jury erred in allocating fifty percent of the causation to boat design and fifty percent to the crew and platform owners. Allocation of fault is a question for the factfinder, and is reviewed under the *Boeing* "substantial evidence" standard. *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 166 (5th Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

Under Snyder's reconstruction of the accident, which, as previously discussed, the jury was entitled to accept, the TEXAS LADY's collision with the platform legs was a minor impact, one that should not occur but which does occur with some frequency whenever boats maneuver near fixed objects. In the jury's mind, the TEXAS LADY showed an unexpected susceptibility to this minor collision. Because the collision was slight, the jury could believe that Allen and Cameron wasted time looking for damage, time which they could have employed in getting out safety equipment or attempting to reach the platform twenty-five to thirty yards away. Given this view of the sequence of events, we cannot say that the jury did not have substantial evidence for its allocation of fault.

### D. *Damages*

■ Whittaker challenges three damage findings made by the jury: the amount for Allen and Cameron's pain and suffering, for the Allen family's lost inheritance, and for the Allens' loss of support. Although DOHSA does not provide damages for a decedent's pain and suffering, a DOHSA plaintiff may recover such damages under a state survival statute. *Solomon v. Warren*, 540 F.2d 777, 792 (5th Cir.1976), *cert. dism'd*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). Snyder and Cameron did plead a pendant cause of action under the Texas Survival Statute. Tex.Civ.Stat. art. 5525 (now Tex.Civ.Prac. & Rem.Code § 71.021). Texas law governs, but for purposes of the issues raised here, it is essentially the same as the general maritime and Jones Act law. A plaintiff seeking to recover for his decedent's pain and suffering must prove, by a preponderance of the evidence, that the decedent was conscious after realizing his danger. *Deal v. A.P. Bell Fish Co.*, 728 F.2d 717, 718 (5th Cir.1984) (Jones Act drowning case); *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1156 (5th Cir.1981) (Texas diversity suit); *Davis v. Parkhill–Goodloe Co.*, 302 F.2d 489, 495 (5th Cir.1962) (Jones Act drowning case); *Thompson v. Offshore Co.*, 440 F.Supp. 752, 761 (S.D.Tex.1977) (Jones Act and general maritime law); *see also Haley v. Pan American World Airways*, 746 F.2d 311, 315 (5th Cir.1984) (same test under Louisiana law); *Solomon*, 540 F.2d at 792 (same test under Florida law). The issue is for the factfinder, which may consider direct, circumstantial, and expert evidence. *Haley*, 746 F.2d at 316; *Deal*, 728 F.2d at 718–19; *Ballou*, 656 F.2d at 1156; *Solomon*, 540 F.2d at 792–93.

■ In the instant case, the jury heard Banta's testimony that, after the TEXAS LADY capsized, he thought he saw a figure clinging to the hull of the boat. Whittaker's own expert testified that, under the weather conditions that night, a man could survive from eight to twenty hours in the water. This evidence distinguishes the instant case from *Thompson*, where the decedents fell twenty-five feet into the sea and there was no evidence that they survived impact. 440 F.Supp. at 762. Here, the jury could reasonably infer that Allen

and Cameron struggled for several hours in the water.

This Court has declined to overturn a jury award of $15,000 for the four to six seconds of mental anguish experienced by a plane crash victim. *Haley,* 746 F.2d at 317; *see also Solomon,* 540 F.2d at 793 (affirming $10,000 award for pre-impact suffering in plane crash). In light of the evidence the jury heard in the instant case, it cannot be determined that the amount awarded—$100,000 for each decedent—constituted an abuse of discretion.

■ Second, Whittaker contends that the jury lacked substantial evidence to find that the Allens' loss of inheritance damages were $300,000. Loss of inheritance is a permissible element of DOHSA damages, and its determination is left to the trier of fact. *Tallentire v. Offshore Logistics, Inc.,* 800 F.2d 1390, 1392 (5th Cir.1986); *Tallentire v. Offshore Logistics, Inc.,* 754 F.2d 1274, 1287 (5th Cir.1985), *reversed on other grounds* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986); *Solomon,* 540 F.2d at 790. In order to obtain loss of inheritance damages, a wrongful death plaintiff must prove "a reasonable expectation of pecuniary benefit." *Tallentire,* 800 F.2d at 1392; *Solomon,* 540 F.2d at 790. The factfinder will look at the likelihood that the decedent would have accumulated substantial property; how much consumption and taxes would eat into any accumulations; the decedent's past propensity to save or invest; and similar factors. *In re Air Crash Disaster at New Orleans, La., Eymard,* 795 F.2d 1230, 1234-35; *Marks v. Pan American World Airways, Inc.,* 785 F.2d 539, 542-43 (5th Cir.1986); *Tallentire,* 754 F.2d at 1287; *Higgins v. Kinnebrew Motors, Inc.,* 547 F.2d 1223, 1225-26 (5th Cir.1977); *Solomon,* 540 F.2d at 790-92.

Snyder's expert witness, an economist named Donald Huddle, testified that Allen's partnership in the boat would have been worth at least $286,316 by the time Allen reached age sixty-five. Allen's partner, Joe Buckmaster, testified that the boat made a higher profit than average, and estimated that a share would be worth $536,953. Dr. Huddle did not carry his calculations beyond age sixty-five, but he testified that, even after retiring as a boat captain, Allen would likely continue to work at the kind of shoreside boat investments engaged in by Buckmaster. Buckmaster, testifying on his own income from boat partnerships, estimated that he would have earned about $50,000 from the TEXAS LADY in 1986, if it had brought in an average catch. The jury could reasonably have inferred that Allen, had he lived, would have been able to make similar investments. The jury also heard evidence that the Allens lived conservatively and that Allen reinvested much of his earnings in the shrimp business. Evidently, the jury took all of this evidence—the $286,000 to $536,000 partnership stake, possibilities of substantial post-retirement earnings, saving propensity—and reached the conclusion that Allen's estate would contain $300,000 by the time he achieved his life expectancy. While this conclusion incorporates several inferences, those inferences are based on concrete figures and represent more than the speculation condemned in *Eymard,* and *Marks. Eymard,* 795 F.2d at 1235; *Marks,* 785 F.2d at 542. Hence, we decline to disturb the jury's loss of inheritance verdict.

■ Finally, Whittaker argues that the jury should not have awarded $630,000 to the Allens for loss of future support. Whittaker points to Dr. Huddle's admission, on cross examination, that the present value of Allen's future earnings, up to retirement as a boat captain and after taxes and personal consumption, would be $520,000. However, on redirect examination, Huddle clarified that the $520,000 figure did not include any depreciation allowances that Allen would have been able to take on his boat, or any amount for the services Allen would provide his family. The jury apparently believed Huddle's earlier, higher figure. We do not find the jury's reliance on Huddle's testimony unreasonable.

E. *Prejudgment Interest*

■ The district court awarded ten percent per annum prejudgment interest on the awards for losses occurring before the

judgment. Whittaker argues that Snyder and Cameron's survivors cannot receive prejudgment interest because such interest is an admiralty remedy, and the case was tried on the "law side" of the court.

The complaint in the instant case asserted federal question, diversity, and admiralty jurisdiction. Record Vol. 1 at 131. Both parties asked for a jury, and the district court granted their request. This Court has held that a plaintiff who requests a jury trial and fails to elect to proceed in admiralty will be considered to have proceeded on the law side of the court. *Martin v. Walk, Haydel & Associates, Inc.*, 794 F.2d 209, 212 (5th Cir.1986). Thus, it appears that the district court in the instant case acquired jurisdiction in law rather than admiralty.

Whittaker urges us to apply a line of cases under the Jones Act, 46 U.S.C. § 688. The Jones Act allows a seaman plaintiff to sue for death or personal injury either in a federal court under admiralty jurisdiction or in a state or federal court under legal jurisdiction, if the seaman meets other jurisdictional requirements. *See generally* G. Gilmore & C. Black, *The Law of Admiralty* 340–43 (2d ed. 1975). However, the seaman must make a trade-off: if he elects to proceed at law, he can have a jury but must forego prejudgment interest; if he elects to proceed in admiralty, he can have prejudgment interest but no jury. *Martin*, 794 F.2d at 212; *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 491 (5th Cir.1985); *Theriot v. J. Ray McDermott & Co., Inc.*, 742 F.2d 877, 883 (5th Cir.1984); *Wyatt v. Penrod Drilling Co.*, 735 F.2d 951, 955 (5th Cir.1984); *Barrios v. Louisiana Construction Materials Co.*, 465 F.2d 1157, 1167–68 (5th Cir.1972); *Sanford Brothers Boats, Inc. v. Vidrine*, 412 F.2d 958, 972–73 (5th Cir.1969) (citing cases going back to 1930); *National Airlines, Inc. v. Stiles*, 268 F.2d 400, 406 (5th Cir.), *cert. denied*, 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959). This long-standing rule is generally cited without discussion, but some courts have justified it by pointing out that, in the typical personal injury suit under the Jones Act, the bulk of the damages will occur in the future, and that

imposition of prejudgment interest would therefore be unjust. *Wyatt*, 735 F.2d at 955 n. 3; *Barrios*, 465 F.2d at 1168. Other courts have stated that calculating prejudgment interest on ongoing damages would be difficult for a jury. *Vidrine*, 412 F.2d at 973 n. 13; *Stiles*, 268 F.2d at 406. This Court has observed that the task of calculating prejudgment interest is easier in wrongful death cases where the loss occurs at one time. *Barrios*, 465 F.2d at 1168; *Stiles*, 268 F.2d at 406 & n. 6.

Whittaker urges this Court to apply this Jones Act rule to DOHSA cases. We find no precedent directly on point, perhaps because, until a recent Supreme Court case, it was far from certain that DOHSA cases could be brought in law courts. *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). *Tallentire* made it clear that such cases could be brought at law but that the substantive provisions of DOHSA would apply. *Id.* 106 S.Ct. at 2497.

This Court held, long ago, that DOHSA's provision of "fair and just compensation for the pecuniary loss sustained," mandated prejudgment interest in the absence of special circumstances. *Stiles*, 268 F.2d at 406; 46 U.S.C. § 762. We do not believe that the rationale for disallowing prejudgment interest in Jones Act cases brought at law justifies disallowing that interest in DOHSA cases brought at law. Most of the damages in a wrongful death case occur in a moment. Calculation of prejudgment interest from that moment is a relatively easy task. In the instant case, the district court asked the jury to set each element of damages separately, and then the court itself performed the prejudgment interest calculation.

In a roughly analogous situation, a plaintiff may bring an action in a law court, seeking both legal and equitable relief, obtain a jury verdict on the legal relief, and receive a ruling from the court on the equitable remedy. The plaintiff need not elect between his legal and equitable remedies, so long as the forum has jurisdiction to hear both claims. The Jones Act rule originated before 1966 and the unification

of law and admiralty, when admiralty and law courts operated in radically different ways. Today, no such gulf yawns between law and admiralty. The recent *Tallentire* case makes it clear that, however a court obtains jurisdiction over a DOHSA case, the substantive law to be applied remains the same. 106 S.Ct. at 2497. To make prejudgment interest depend on the route by which a plaintiff arrived in federal court is to confuse jurisdiction with remedy in a way no longer accepted in other areas of the law. Moreover, the specific rationales advanced for maintaining the artificial distinction in Jones Act cases do not apply to DOHSA cases. For all of these reasons, we decline to import the Jones Act election rule into the DOHSA jurisprudence. The district court did not err in awarding prejudgment interest to Snyder and Cameron on their past damages.

## III. CONCLUSION

This was a hard-fought, close case arising from tragic events whose best witnesses, Allen and Cameron, are dead. The jury weighed the conflicting evidence and decided that the design of the TEXAS LADY was defective, causing 50 percent of the tragedy. These findings were supported by substantial evidence, as were the jury's findings on damages. The district court did not err in admitting certain documents and expert testimony. Nor did the district court err in assessing prejudgment interest. For these reasons, the judgment of the district court is

AFFIRMED.